UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> CELSIUS NETWORK, LLC and ALEXANDER MASHINSKY, <br><br> Defendants. | Case No. 1:23-cv-6008 <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.  SUMMARY

1.  Beginning in 2018 and continuing through at least June 2022 (the "Relevant Period"), Celsius Network, LLC (together with its parent and related entities, "Celsius") and Alexander Mashinsky ("Mashinsky"), one of its founders and chief executive officer ("CEO"), (together "Defendants") engaged in a scheme to defraud hundreds of thousands of customers by mispresenting the safety and profitability of its digital asset-based finance platform.

2.  Defendants, via publicly available videos, blog posts, livestreams and postings on social media and their website, touted Celsius as a "safe" alternative for customers' digital asset commodities, akin to a traditional bank. Defendants not only promised customers that their deposited digital asset commodities would be safe with Celsius, but also promised customers high yield interest payments on these deposits.

3.  Based on Defendants' promises of high yield interest payments and bank-like investment safety, Celsius received deposits from customers totaling approximately $20 billion.

During the same time, Defendants engaged in a pattern of making misleading and false statements to induce customers to deposit and not withdraw their digital asset commodities from the Celsius platform.

4.    In order to meet the returns promised to its customers, Celsius engaged in increasingly risky investment strategies, including the extension of millions of dollars in uncollateralized loans and millions of dollars in unregulated, risky decentralized finance agreements.

5.    As the value of digital assets fell precipitously market-wide, Defendants' risky bets on uncollateralized loans and unregulated decentralized finance agreements caused Celsius to suffer losses totaling hundreds of millions of dollars, losses that had long preceded market-wide decline.

6.    Despite suffering devasting losses, Defendants continued to promote the safety and viability of Celsius, and failed to disclose these losses to customers. Even worse, despite its worsening financial position, Defendants continued to solicit new customers with the same misrepresentations that digital asset commodities deposited with Celsius were safe and would earn customers high yield returns.

7.    By May 2022, Celsius's risky investment strategies were losing millions of dollars and customers were withdrawing their digital asset commodities at an accelerated pace. These factors, among others, caused Celsius's liabilities to exceed its diminishing assets by hundreds of millions of dollars.

8.    Again, Defendants continued to falsely assure customers that Celsius was in a financially secure position, that its customers' digital asset commodities were safe and that Celsius had sufficient funds to meet its customers' withdrawal requests.

9.      In a video aired on May 13, 2022, Mashinsky described the company's condition as such:

> Celsius is stronger than ever. We have billions of dollars in liquidity. Anyone who needed to withdraw their funds, got their funds back. Anyone who wanted to come in and earn or take a loan or anything else got served. We're open for business and we continue to do what Celsius does best: serve the community, protect the community, make sure your assets are there when you need them.

10.     On June 12, 2022, Celsius froze customer withdrawals. A month later, on July 13, 2022, Celsius filed for bankruptcy, revealing that its liabilities exceeded its assets by more than one billion dollars.

11.     In addition to the Defendants' fraudulent conduct, Celsius operated a commodity pool ("Celsius Pool") in which Celsius pooled customer assets for the purpose of trading commodity interests, such as, but not limited to, futures contracts, for the benefit of Celsius's customers ("pool participants"). Celsius acted as an unregistered commodity pool operator ("CPO") of the Celsius Pool by soliciting, accepting, and receiving assets for the purpose of trading commodity interests; and Mashinsky operated as an unregistered associated person ("AP") of that CPO by soliciting members of the public to contribute to the Celsius Pool. Celsius also failed to provide prospective pool participants with pool disclosure documents.

12.     Through this conduct and the conduct further described herein, Defendants violated Sections 4k(2), 4m(1), 4o(1)(A)-(B) and 6(c)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B) and 9(1), and Commission Regulations ("Regulations") 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022). Mashinsky, as a controlling person of Celsius, is liable for each of Celsius's violations. In addition, Mashinsky directly violated 7 U.S.C. § 6k(2) by failing to register as an AP of a CPO.

13.     Accordingly,  the CFTC brings  this action  pursuant to Section  6c of the Act, 7 U.S.C. § 13a-l, to enjoin  Defendants' unlawful  acts and practices and to compel their  compliance with the Act.  In addition,  the CFTC seeks civil  monetary penalties  and remedial ancillary  relief, including,  but not limited  to, trading  and registration bans, disgorgement,  restitution,  pre- and post-judgment  interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

14.     This  Court  has jurisdiction  over  this action  under  28  U.S.C.  §  1331  (federal question  jurisdiction)  and 28 U.S.C. § 1345 (district  courts have original  jurisdiction  over civil actions commenced by the United States or by any agency expressly authorized  to sue by Act of Congress).  Section  6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes  the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged,  is engaging,  or is about to engage in any act or practice constituting  a violation  of any provision  of the CEA or any rule, regulation,  or order thereunder.

15.     Venue properly  lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business  in the Southern  District of New York and engaged  in acts and practices  in violation  of the Act and Regulations  within  this District. Mashinsky  also resides in New York, New York.

## III.     PARTIES

### A.     The CFTC

16.     Plaintiff **Commodity Futures Trading Commission** is the independent  federal regulatory  agency charged  by Congress  with  the administration  and enforcement  of the Commodity  Exchange Act ("CEA") and Regulations  promulgated  thereunder.  The Commission

maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

**B.** **Defendants**

17.     **Celsius Network, LLC** (together with its parent and related entities, "Celsius") is a Delaware limited liability company with its principal office in Hoboken, New Jersey. Celsius conducted its business on the internet through a website accessible to the general public at https://www.celsius.network and which was also accessible to the general public through Celsius' proprietary mobile device application.   Celsius is currently in chapter 11 bankruptcy in the U.S. Bankruptcy Court in the Southern District of New York, Case No. 22-10964 (MG).  None of the Celsius entities have ever been registered with the Commission in any capacity.

18.     **Alex Mashinsky** ("Mashinsky") is a co-founder and the former chief executive officer of Celsius. Mashinsky controlled Celsius through his position as CEO and as the largest equity stakeholder in Celsius.  Mashinsky resides in New York, New York.  Mashinsky has never been registered with the Commission in any capacity.

## IV.     STATUTORY BACKGROUND AND LEGAL FRAMEWORK

19.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

20.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Digital assets include virtual currencies, such as Bitcoin (BTC), Ether (ETH), USD Coin (USDC), and Tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value. Certain digital assets are "commodities," including Bitcoin, Ether, USDC, Tether, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

21.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including Bitcoin and Ether futures and options, by boards of trade designated by the Commission, including the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE").

22.     Section 6c(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

23.     CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), promulgated pursuant to the authority in CEA Section 6(c)(1), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or

(3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

24.     Section 13c(b) of the Act, 7 U.S.C. § 13c(b) provides that "any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."

25.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), provide that each "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his [or her] employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

## V.       FACTS

### A.       The Founding of Celsius

26.     The idea for Celsius was conceived by Mashinsky and another individual in the summer of 2017 during the digital asset boom.

27.     Mashinsky first envisioned Celsius as a peer-to-peer lending network that would allow users to borrow tokens from or lend tokens to other users, with loans managed on the blockchain by smart contracts.

28.     Before Celsius opened for business, Mashinsky had changed the original business model from a lending facility to a "simple app that would accept your coins and we would deploy them for you . . . ."

29.     Under this model, Celsius's customers would allow Celsius to pool their digital assets and deploy these pooled assets to generate revenue for Celsius which would be returned to the customers in the form of weekly interest payments or "rewards."

30.     Starting in September 2017, Mashinsky began marketing Celsius through various social media sites, conferences and crypto industry events.

31.     In October 2017, Mashinsky began to pre-sell what would later become the "CEL" token, Celsius's native currency, in private offerings to international and accredited customers.

32.     These pre-sales, as well as an anticipated initial coin offering, would provide Celsius with the initial capital needed to fund its business operations.

33.     In March 2018, Celsius launched its platform and in June 2018, Celsius released its mobile application.

34.     Celsius claimed it was different from traditional financial institutions because it was "democratized" and "[b]uilt on the belief that financial services should only do what is in the best interests of the community."

**B.     Celsius's Business Entities**

35.     Celsius Network Inc. was incorporated in Delaware on February 8, 2018, by Mashinsky.

36.     On February 9, 2018, Celsius Network Inc. incorporated Celsius Network Limited as a United Kingdom private limited company.  Celsius Network Limited was the entity that interacted with customers through the summer of 2021.

37.     Today, Celsius Network Limited operates as the holding company for roughly twenty directly or indirectly owned subsidiaries.  Celsius Network, Inc. owns approximately 60% of Celsius Network Limited, and outside investors own the other approximately 40%.

38.     In October 2020, Celsius Mining LLC was incorporated as a limited liability company in Delaware.

39.     In June 2021, Celsius Network LLC was incorporated as a limited liability company in Delaware and moved its corporate headquarters from the United Kingdom to New Jersey.

40.     In August 2021, Celsius transferred all of its customer accounts from Celsius Network Limited to Celsius Network LLC.

## C.     **Celsius Products and Services**

41.     According to Mashinsky, Celsius was one of the first digital asset platforms that allowed customers to transfer digital assets, including digital asset commodities such as Bitcoin, Ether, USDC, Tether, and others, to a platform and then earn rewards on the transferred assets and/or take loans using the transferred assets as collateral.

42.     Celsius allowed customers to deposit their digital asset, including digital asset commodities, with Celsius in exchange for annual percentage yield ("APY") payments ranging from 4.5 to 17 percent.

43.     To generate the income to pay its customers the promised APYs, customers' digital asset commodities would be pooled and deployed by Celsius as loans to institutional and retail customers and for other revenue generating activities, including, but not limited to, the trading of futures contracts. For this trading, Celsius operated the Celsius Pool and was not registered as a CPO. Additionally, Mashinsky did not register as an AP of a CPO, despite soliciting members of the general public to contribute to the Celsius Pool.

44.     In addition, Celsius, while acting as CPO of the Celsius Pool, failed to provide pool disclosure documents as required by Regulation 4.21, 17 C.F.R. § 4.21 (2022), including but not

limited to documents providing or describing required cautionary statements, risk disclosures, fees and expenses incurred, past performance disclosures, and others.

45.     Celsius also offered customers custodial, lending and brokerage services relating to the numerous digital assets, including digital asset commodities, it accepted from customers.

46.     Celsius used the returns it received on its asset deployment to pay customers their "rewards" and kept the remaining money, when there was any, as profits for the company. If, however, Celsius failed to profitably deploy its customers' assets in investments that earned more than the interest owed to its customers, Celsius lost money.

47.     Additionally, to the extent that Celsius invested customers' assets in long-term illiquid ventures, Celsius needed to retain sufficient capital to meet the demand for withdrawals.

48.     To increase its revenue streams, aside from retail and institutional lending, Celsius also engaged in DeFi lending, staking, Bitcoin mining and custodial services.

**D.     The "Earn" Program**

49.     Celsius's most popular product was the "Earn" Program, which allowed customers who transferred certain digital assets, including the digital asset commodities described herein, to Celsius to earn rewards, referred to as yield, on their deposited assets.

50.     Celsius promoted the Earn Program by promising some of the highest yields in the market, as much as 17% per year and describing the program as the "safest place for your crypto."

51.     Mashinsky explained that the rates were "subject to change on a weekly basis as they are calculated by the weekly demand for each coin combined with our promise that up to 80% of our profits are returned to the depositors."

52.     Mashinsky described the Earn Program as "sleep to earn," where customers merely deposited their digital assets, including but not limited to digital asset commodities, and let Celsius

do all the work to generate returns. As Mashinsky explained, "you don't have to do anything, you just go to sleep, and every Monday we pay you yield."

53.     Celsius portrayed the Earn program as low risk due to the fact that Celsius only provided loans to reputable counterparties that pledged "over 100% collateral" to acquire loans from Celsius.

54.     Celsius encouraged its customers to earn rewards in CEL, by offering higher reward rates for CEL than other digital assets.

**E.     Unsustainable Business Model**

55.     Starting in mid-2020, with digital asset values soaring and Celsius offering higher reward rates than anyone else in the market, Celsius experienced positive growth indicated by the number of users on the platform, assets under management and the price of the CEL token.

56.     Despite the outward signs of success, Celsius was unable to generate sufficient returns from its asset deployments to cover the high rewards it was offering to its customers.

57.     Celsius began to operate close to, or under, net interest margin ("NIM"), which Celsius calculated by measuring the difference between the yield that Celsius earned on its deployed assets relative to the cost of those same assets.

58.     From the outset, Celsius offered some of the highest reward rates in the industry, and promised its customers that they would "always receive a minimum of at least 5% annual interest on any lent crypto currencies."

59.     In 2020, Mashinsky posted to Twitter that "[t]he best rates to earn interest are on @CelsiusNetwork" and that, with Celsius, people can "earn the highest yield in the industry."

60.     Customers began receiving rewards in the third quarter of 2018 and within months, Celsius dramatically increased the reward rates for Bitcoin, Ether and Litecoin deposits.

61.     Prior to July 1, 2021, Celsius did not have a formal policy for setting reward rates, and decisions were made regarding rates to address Mashinsky's concern that unless Celsius offered the highest in the industry, customers would choose a competing lending platform.

62.     Celsius kept the reward rates high despite the fact that it was unable to generate sufficient yield on its asset deployment to pays its customers the rates it promised.

63.     It was clear to some Celsius employees, at least as early as 2019, that the company may not have enough cash to meet its business expenses.

64.     Other Celsius employees believed that with reward rates as high as they were, the return on asset deployment would never be sufficient to keep a positive NIM.

65.     By December 29, 2021, Mashinsky continued to prioritize moving Celsius's NIM "to positive territory" but his solution was not to lower reward rates or slow customer growth, but rather to deploy Celsius's assets in riskier investments to chase higher yields.

**F.     Mounting Losses, Withdrawals and "The Pause"**

66.     As the digital asset market began to cool in the summer of 2021, Celsius began to suffer large financial losses and limited opportunities to deploy its remaining assets.

67.     Despite the fact that Celsius was losing money on its asset deployments and finding it difficult to access new revenue streams, Mashinsky refused to lower reward rates for fear customers would leave the Celsius platform.

68.     As customer reward obligations mounted, Celsius was unable to generate sufficient revenue to meet these obligations. This problem was made worse by the fact that Celsius bought CEL on the open market to pay customer rewards, but then was unable to deploy the CEL to earn any additional income and had outlaid Bitcoin and other digital asset commodities to purchase the CEL.

69.     Dating back to 2020, Celsius had also used customer assets to fund operational expenses and rewards, failed to adequately track or reconcile customer assets and liabilities on a digital asset by digital asset basis, and been unable to recognize a significant shortfall in customer deposited digital asset commodities.

70.     In 2021, Celsius's reward obligations to customers exceeded net revenue by approximately $1 billion and by $380 million in the first half of 2022.

71.     At the same time, Celsius was also incurring significant losses from deployments dating back to at least 2019. In total, by May 2022, Celsius had suffered over $1.7 billion in total losses.

72.     By June 2022, Celsius began to use new deposits made by customers to make payments to existing customers.

73.     Based on the precarious state of the digital asset markets, beginning in May 2022, concerns arose that Celsius may not be able to cover its customers deposits.

74.     Between June 10 and 12, 2022, Celsius received $428.3 million in withdrawal requests, but was unable to meet these requests.

75.     On June 12, 2022, Celsius announced that it was pausing all customer withdrawals, referred to in bankruptcy filings as "The Pause."

## G.    Defendants' Materially Misrepresentations

76.    From the moment it began accepting customers funds, Defendants engaged in an aggressive and often misleading advertising campaign to find new customers and retain the customers who had already deposited their digital asset commodities with Celsius.

77.    Despite the fact that Celsius was having difficulty generating revenue to meet the rewards earned by its growing customer base and was unable to effectively deploy its assets, Defendants always painted a picture of a company that was safe and prosperous. This was false.

78.    Mashinsky regularly misrepresented the safety and profitability of Celsius in his tweets and "Ask Mashinsky Anything" videos ("AMA") that were typically live-streamed every Friday afternoon beginning in 2020.

79.    Mashinsky, and guests, discussed a wide variety of topics each week during the AMAs that often included the CEL token, reward rates, new products and services, and updates on the number of new customers and how certain assets were performing.

80.    Celsius was aware that Mashinsky was making false and misleading statements during his AMA's and other appearances so often that a team of employees were tasked with editing AMA's after they were aired to delete problematic statements; emails were circulated documenting Mashinsky's misstatements during these broadcasts, when he said them and why they were false. Mashinsky was repeatedly told not to say certain statements, but continued to do so.

81.    Defendants repeatedly represented to its customers and investing public that Celsius was better than a bank and often used the hashtag "unbank yourself" in its public communications.

82.     Defendants promised "financial freedom through crypto" and claimed to provide fair interest rates, no fees and instantaneous transactions, things a traditional bank could not provide.

83.     Celsius stated that wealth for all could be created through its business model described as such in a since-deleted blog post:

> [t]he Celsius business model is structured to do the exact opposite of what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest.

84.     In his public statements, Mashinsky also repeatedly talked about the level of trust and transparency Celsius customers enjoyed.  For example:

a) We have seen time and time again that customers choose Celsius for yield and loans because they trust us, and our goal is to always act in their best interests and consistently deliver industry-leading transparency.

b) Celsius was built to act in the best interest of the community, and we have consistently delivered honest, transparent, and rewarding financial services

c) Our relationships with our 230,000 community members are built on trust, because they count on us to act in their best interests . . . we're providing additional transparency into our business, which remains one of the industry's most reliable, secure and rewarding platforms for putting unparalleled economic freedom into the hands of the people

85.     Despite Mashinsky's claims of trust and transparency, Defendants, from the beginning of its existence, repeatedly misrepresented the health and safety of the company.

## H.     Defendants Repeatedly Lied about the Amount Raised in Celsius's Initial Coin Offering

86.     Celsius's public initial coin offering ("ICO") took place in March 2018.  An ICO is the digital asset industry's equivalent of an initial public offering (IPO). A company seeking to raise money to create a new coin, app, or service can launch an ICO as a way to raise funds.

87.    Although Celsius publicly represented that its ICO had raised $50 million, in fact, ICO sales only reached $32.8 million.

88.    On May 17, 2018, Mashinsky gave an interview from Blockchain Week in New York that appeared on YouTube. In the interview Mashinsky responded to a question about how the Celsius ICO did and he responded, "We raised $50 million."

89.    In an article published by CoinCentral on November 11, 2018, Mashinsky again stated "[o]ur ICO (Initial Coin Offering) raised over $50 million."

90.    This statement was untrue, and Mashinsky knew it was false. The ICO only raised $32.8 million.    Celsius employees often discussed how Mashinsky continuously publicly misrepresented the amount raised by the ICO and that they needed to make sure Mashinsky did not continue to say the "wrong things" about Celsius' funding because "[t]his mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did)." By misrepresenting the value of the ICO, Defendants mislead the public about the financial standing of Celsius and made the ICO appear more successful than it was in reality.

## I.    Defendants Routinely Misrepresented the Profits Distributed to Customers

91.    Defendants routinely stated that Celsius returned most of their revenue to its customers. At times, Defendants represented that Celsius gave up to 80 percent of its revenue to its customers.

92.    This claim was repeated in marketing materials and during Mashinsky's AMAs.

93.    For example, on March 19, 2019, Celsius posted to Twitter, "Our model is simple, we give 80% back to the community. Banks keep 80% to themselves. It's not like there is a complicated algorithm that nobody knows about."

94.     On September 19, 2019, Celsius replied to a tweet explaining, "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments. Your bank could pay you the same rates, they just prefer to keep the profits for themselves. #UnbankYourself."

95.     On October 11, 2021, Mashinsky gave an interview posted to YouTube on the Paul Barron Network channel.  In a written caption accompanying the video, Celsius is described as "a crypto platform with over 1 million users that earns you up to 17% yield on your crypto, rewards you every week and lets you borrow cash at the lowest rates. Up to 80% of Celsius revenue is paid back to the community as weekly rewards on crypto."

96.     During the October 11th interview, Mashinsky stated that banks "make tremendous amount of yield, they just choose to give 100 percent of that, or almost 100 percent of that to their shareholders and Celsius chooses to create the same yield and give a very large chunk of that to its customers." Mashinsky claimed that unlike a bank that shares its revenue or yield on its loans with its owners, Celsius shared most of the yield it earned with its customers.

97.     Mashinsky continued to repeat the claim that Celsius shared "most" of its yield revenue with customers.  During an interview with CNBC posted to YouTube on April 13, 2022, Mashinsky said that unlike banks who make profits from using customers' money and keep it for themselves, Celsius "give[s] most of the profit or most of the yield back to the community.  So Celsius as an example paid the community over $1 billion in yield and this is the kind of yield you cannot get from banks."

98.     Despite claiming that it gave 80% of its revenue to its customers, Celsius never set customer reward rates based on its loan yield or other asset deployment revenue, a practice of which Mashinsky had knowledge.

99.     In response to regulatory inquiries in June and July 2021, Celsius described its rate-setting process as involving a multitude of factors, but indicated that "a customer's return is not determined by reference (or linked) to Celsius's generation of revenues from crypto assets received from customers."

100.    Despite this admission to regulators, Defendants falsely claimed repeatedly that Celsius returned 80% of its revenue to customers.

## J.      Defendants Misrepresented the Number of Active Celsius Users

101.    In order to have a sufficient amount of deployable assets, Celsius needed a steady stream of customer deposits to sustain its growth. Mashinsky was the main promoter of Celsius and constantly used social media and other forms of outreach to solicit new customers.

102.    If Celsius failed to earn revenue from its deployed assets or had assets in long term obligations, the only remaining revenue stream available for new deployments was new customer deposits.

103.    In a blog post on March 12, 2019, Mashinsky explained: "The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise."

104.    Aware that new customers were the key to sustained growth and more deposits, Mashinsky repeatedly and knowingly exaggerated the number of active Celsius's customers, making Celsius appear significantly more popular than it actually was.

105.    In a YouTube interview on November 17, 2021, for example, Mashinsky, stated "we have a million and a half customers…they hold over 25 billion dollars' worth of digital currencies…."

106.     In another YouTube interview on June 1, 2022, Mashinsky claimed: "we have a community of almost two million people…."

107.     While Celsius had approximately 1.7 million registered users as of July 2022, in reality, most of them were not active customers, a fact Mashinsky did not disclose.

108.     From 2019 through 2022, roughly two-thirds of registered U.S. Celsius users held less than one dollar's worth of digital assets in their Celsius accounts. For example, by June 17, 2022, Celsius had 584,192 registered U.S. users; of those, 386,294 (66%) had an account balance of less than one dollar.

109.     Defendants misrepresentations of the true number of active customers was misleading to customers, making it appear that Celsius was more successful and more widely used than it actually was.

**K.     Defendants Mislead Customers About Celsius' Regulatory Compliance**

110.     By 2021, Defendants were aware that regulators in several states, were investigating the business activities of Celsius and that these regulators had either directed Celsius to stop illegal activities in their states or had indicated their states' intention to seek such an order.

111.     Despite this fact, in a December 3, 2021, YouTube interview, Mashinsky falsely claimed that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything…."

112.     In an interview from April 2022, Mashinsky said that "We are monitored by eight different agencies. Companies like us are following all the rules, A to Z, seven days a week."

113.     In an April 15, 2022 AMA, Mashinsky, after explaining the level of customer concern over governmental interest in Celsius, said "There's clarity from different regulators, both

from states and federal regulators, [I am] telling you the user that there's no issue, there's no legal issues as least with what Celsius provides."

114.    Following this AMA, Mashinsky also stated on April 18, 2022 that "we have an agreement with the SEC and state regulators."

115.    Despite being aware of numerous investigations, cease and desist orders, and regulatory uncertainty surrounding Celsius's business activities, Mashinsky knowingly made the above false statements to assuage customer concerns, prevent withdrawals and entice new customer deposits under the veil of regulatory certainty.

**L.    Defendants Lied About the Safety of Customers' Assets**

116.    In order to entice customers to deposit their digital asset commodities with Celsius, Mashinsky repeatedly and misleadingly said that customer deposits with Celsius were as safe, if not safer, than money deposited in a traditional bank.

117.    Celsius's internal "Brand Guidelines" suggested to marketing personnel that they use specific language to describe the security Celsius customers could expect, such as, "We're for anyone who's ever looked at their mattress and wondered if it could do a better job of keeping their money safe."

118.    On its website, and in other communications with its customers, Celsius said that "our top priority is keeping your assets secure."

119.    In a March 7, 2019, interview at the NASDAQ MarketSite in Times Square, Mashinsky claimed that money deposited with Celsius was "as safe as it is with the bank, which is the alternative, it's just that [Celsius] network is always acting in your best interest."

120.    Beginning as early as March 2020, Mashinsky repeatedly claimed that Celsius's risk management team avoided risky investments and instead obtained high yield at low risk. On the Celsius

YouTube channel, in a video titled "How Celsius Earns Yield," Mashinsky explained, "Celsius generates a certain amount of profit by lending assets . . . the key is to get high yield at a low risk."

121.    During an AMA on October 1, 2021, Mashinsky said, "Our number one priority is keeping the funds that we're lending out safe and we would rather . . . lend large scale to a counterparty . . . than to risk earning a ridiculously high yield lending to a shady character."

122.    Mashinsky further misled customers by promising that Celsius would take full responsibility for safeguarding customer assets, including from any shortfalls or loss of value caused by Celsius's use or "deployment" of customers' digital asset commodities.

123.    In his December 10, 2021, AMA, Mashinsky declared that "Celsius takes full responsibility if anything goes bad" and claimed that if "something bad happens with the Celsius deployment … Celsius [is] standing behind it."

124.    Even as uncertainty gripped the crypto market, on May 11, 2022, both Celsius and Mashinsky posted to Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe. We continue to be open for business as usual."

125.    Despite these assurances of safety, Defendants knew that Celsius was never as safe as a traditional bank, and as its financial position became more dire, Celsius increasingly engaged in riskier investments with its customers' money.

**M.**    **Defendant Falsely Claimed that all Loans Made by Celsius Were Fully Collateralized**

126.    Defendants made numerous representations to their customers and potential customers about the importance of collateralized loans.

127.    Defendants told their customers that Celsius did not "do non-collateralized loans . . . Celsius will not do that because that would be taking too much risk on your behalf."   Non-

collateralized loans are problematic because if the borrower defaults on the loan, a lender, such as Celsius, has no collateral to retain or liquidate to offset the loss on the loan.

128.    On April 4, 2020, Mashinsky posted to Twitter, "We only do asset backed lending so always have 200% collateral."

129.    In a July 17, 2020 AMA, Mashinsky stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

130.    In a November 6, 2020 AMA, Mashinsky said, "We do not do unsecured lending."

131.    In an April 30, 2021 AMA Mashinsky said, "A run on the bank cannot happen at Celsius because Celsius never lends more than what it has …we always have enough coins and enough collateral and so on to return all the assets to all of our users."

132.    As late as April 2022, Mashinsky continued to repeat the claim that Celsius did not have non-collateralized loans, "On the institutional side, we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer any non-collateralized loans."

133.    In reality, Celsius had numerous positions that were either not fully collateralized or had no collateral at all and Defendants were aware of these facts.

134.    In 2020, Celsius made almost $10 million in uncollateralized loans. In 2021, that number ballooned to at least $203 million, and in the first half of 2022, Celsius made at least $394 million in uncollateralized loans.  In fact, in a Board meeting in May 2022 which Mashinsky attended, it was reported that only twenty percent (20%) of institutional loans by Celsius were fully collateralized and valued at $643 million while forty-seven (47%) were unsecured and were valued at $1.492 billion dollars.

135.    From 2020 through June 2022, Celsius made over 100 uncollateralized loans to at least 19 different counterparties.

N.    **Mashinsky Misrepresented the Extent and Risk of Celsius's Decentralized Finance Risk**

136.    Traditionally, in a centralized finance system, money is held by banks and similar institutions, who facilitate the movement of money between parties for a fee.

137.    With decentralized finance ("DeFi"), digital asset transactions, including loans and payments, can be enabled in a peer-to-peer approach. There is no centralized exchange that holds custody over assets, no involvement of institutional intermediaries such as a futures commission merchant, and users rely on a smart contract-based approach to execute transactions on a blockchain.

138.    DeFi transactions are complex and risky. While transactions on DeFi are usually over-collateralized by digital assets, if the market value of the collateral falls below a threshold prescribed in the smart contract, the DeFi protocols will automatically liquidate the collateral and close the loan. This can result in a significant loss of value for the borrower. DeFi protocols are also risky because they are susceptible to hackers.

139.    Mashinsky personally acknowledged that DeFi posed risks, but assured customers, in a December 3, 2021, YouTube interview, that "Celsius… helps people navigate in a safe way into [the DeFi] environment… because Celsius already did the homework and figured out what's safe."

140.    Mashinsky's statements that Celsius had figured out a safe way to deploy assets via DeFi were false. In reality, at the time of his statements, Celsius had already suffered numerous losses with DeFi transactions.

141.    In August 2020, Celsius engaged a company for the purpose of handling Celsius's DeFi investments. That company placed $500 million worth of Celsius's investor assets in risky DeFi deployments that resulted in losses of at least tens of millions of dollars.

142.    In June 2021, Celsius also lost access to 35,000 Ether worth tens of millions of dollars on a third-party service. Celsius never recovered those assets and Mashinsky failed to disclose this loss to Celsius's customers.

143.    Additionally, in December 2021, Celsius lost Bitcoin, then valued at approximately $50 million, to a hack to a DeFi protocol.

144.    Despite these loses and increasing exposure to DeFi protocols, Mashinsky continued to play down Celsius's use of DeFi. In a June 1, 2022, YouTube interview, Mashinsky stated: "Celsius continues to do what it did for the last five years. Again, most of our business, I would say 90% of our business, has nothing to do with DeFi." This was untrue.

145.    By the spring of 2022, DeFi had grown to become Celsius's single largest deployment category. As of May 25, 2022, Celsius had deployed nearly 30% of its customers' digital assets into DeFi activities, compared to only about 11% in retail lending and 12% in institutional lending.

146.    Celsius's use of DeFi protocols as its primary asset deployment vehicle was in direct contradiction to Mashinsky's repeated claims that customers' assets were deployed in high yield, low risk investments.

**O.**    **Defendant Misrepresented the Risk Profile of Institutional Partners**

147.    During his promotion of Celsius, Mashinsky repeatedly told customers and potential customers that Celsius only worked with credible and reputable counterparties.

148.    In his November 6, 2020, AMA, Mashinsky stated that Celsius "only lend[s] to the first-tier institutions, first tier exchanges…."

149.    Again, on April 13, 2022, Mashinsky falsely claimed that Celsius dealt only with "very credible" institutional counterparties.

150.    As a way to exemplify the quality and safety of the counterparties Celsius dealt with, in an AMA on November 12, 2021, Mashinsky stated that "In four years we have not had a single institution default either not pay the interest or not return the collateral or the long coins that we lend to them." Mashinsky further proclaimed on July 9, 2021, in a video posted on the Paul Barron Network YouTube channel, that Celsius had "Zero loans that went into default with any of our counterparties. . ."

151.    These statements were false. By early 2021, at least two companies defaulted on loans that Celsius had made to them. For example, by letter dated February 9, 2021, Celsius demanded repayment on a digital asset lending agreement entered into on December 3, 2019 and which Celsius contended that the counter party was in breach and defaulted on the loan. If not resolved, Celsius threatened formal legal action.

152.    In email written by Mashinsky to Celsius's Chief Revenue Officer, Mashinsky acknowledged the default of one of the companies noted above in paragraph 150. He stated "[i]t used to be a $3m problem now it is a $17m problem," and "[w]e were suppose to get 200 BTC back. Never happened." This default was also the subject of discussion at an Assets and Liabilities Committee meeting held on July 14, 2021 and at which Mashinsky was present.

153.    Yet, in a November 12, 2021 AMA YouTube video Mashinsky claimed "[w]e have not had a single institution default …". He did not disclose that by then, at least two institutional loan counterparties had defaulted on their agreements. The Celsius team tasked with edited out Mashinsky's false statements noted that his claim about no defaults needed to be removed.

**P.**  **Defendants Misrepresented that Celsius Did Not Engage in Directional Trading**

154.    From the outset, Celsius claimed to engage in a delta neutral trading strategy, meaning Celsius did not trade long or short positions to earn yield, but rather sought to capture difference in prices between products and exchanges.  Delta neutral trading strategies are generally regarded as less risky, since positions are relatively insensitive to market movements and volatility.  Mashinsky explained that traditional banks engaged in this type of trading all the time, but unlike Celsius who returned money to its customers, banks kept this money for themselves.

155.    In a Tweet dated September 29, 2020, Mashinsky wrote "Celsius does not trade or take long or short positions with customer coins."

156.    Mashinsky again described Celsius's trading strategy in a CBNC interview on April 13, 2022 saying "We are what's called a delta neutral strategy meaning. . .Celsius doesn't bet on the market going up or down, our job is just to take advantage of difference in prices between, for example, future and spot or one exchange and another and we take or grab that difference."

157.    Despite Mashinsky's false claims, Celsius routinely engaged in directional trading, a practice of which Mashinsky was aware.

158.    Within Celsius, directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including Mashinsky.

**Q.  Defendant Falsely Claimed Celsius Was Less Leveraged Than It Actually Was In Comparison to Traditional Banks Regarding Leveraged Trading**

159.  Mashinsky routinely said that Celsius was safer than a bank because banks were highly leveraged and Celsius was not.

160.  For example, in a May 7, 2021 AMA, Mashinsky said "And you will see that they are, their leverage is a 100 times greater than Celsius not ten times greater, 150 to 1 leverage. 0.23% leverage 0.23 versus five zero. Okay, so how many orders of magnitude are we talking about that's, you know, what is it 44.3 orders of magnitude, something like that 2.3 orders of magnitude.! That's the real risk, it's not, it's not Celsius before I went under leverage."

161.  In a February 22, 2022 Twitter Spaces broadcast Mashinsky explained: "Oh, yeah, we don't have leverage. It's not like we can go to the Fed and borrow money or, or borrow money from other banks like banks do every day. All right. So it's a completely different system. Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet. And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties. So it's maybe again, instead of 1.0, it's 1.2 or something like that."

162.  Even though he claimed that Celsius did not have leverage akin to a bank, Mashinsky knew otherwise but falsely misrepresented this fact to customers and potential customers. Mashinsky had been told by Celsius senior management that his statements about Celsius's leverage were false and that Mashinsky should cease from making these misrepresentations to the public.

**R.  In Promoting the Sale of CEL, Mashinsky Would Tout His Buying of CEL Without Disclosing that He was Selling More Than He was Buying**

163.    To entice customers to accept CEL through the earn program, Celsius offered its highest rates and Mashinsky constantly promoted CEL.

164.    In AMAs and other public appearances, Mashinsky promoted CEL by touting his purchases of the tokens and as importantly, that he was holding the token since its value was increasing.

165.    In reality, Mashinsky was selling more CEL than he was buying, or simply just selling the CEL he was supposedly holding.  This trading was never disclosed to the public.

166.    For example, during AMAs on October 15, 2021 and December 31, 2021, Mashinsky implored his customers to "HODL" CEL, but failed to disclose that he actually sold CEL during those months.

167.    He repeated this pattern multiple times during the Relevant Period, and what might be at one of the most opportunistic times, he did so in May 2022.  In an AMA on May 13, 2022, Mashinsky stated "I'm holding, I didn't sell." But in May 2022, Mashinsky had sold approximately $2 million worth of CEL.

**S.  Mashinsky Lied to the Public about Celsius's Financial Condition Leading Up to "The Pause"**

168.    Starting in May 2022, based upon their concerns regarding the safety of their assets, Celsius customers began withdrawing hundreds of millions of dollars worth of digital assets, including, but not limited to, digital asset commodities, each day, culminating on May 12, 2002 when customers withdrew over half a billion dollars from the Celsius platform in just one day.

169.    Despite the record number of withdrawals and the fact Celsius's liabilities far exceeded its depleting assets, Mashinsky continued to solicit new customers and falsely represent that Celsius was strong and had the ability to meet the customer demands.

170.    As previously described, Mashinsky continued to implore Celsius's customer to hold on to their CEL tokens, despite the fact that he was selling his own CEL tokens and withdrawing his assets from the platform.

171.    During an AMA on May 13, 2022, Mashinsky stated that "Celsius is stronger than ever, we have billions of dollars in liquidity… and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

172.    On May 16, 2022, in an interview posted on YouTube Mashinsky again proclaimed that Celsius was "standing strong" and that Celsius was "ready with the liquidity."

173.    These statements by Mashinsky, made to assure Celsius's customers and entice new customers, were false and misleading.

174.    By May 13, 2022, Celsius had total assets of less than $12 billion and total liabilities of more than $12.75 billion, resulting in net assets of negative $820 million.

175.    Between May 9, 2022 and May 24, 2022, Celsius customers withdrew over $1.4 billion in assets.

176.    With customers withdrawing assets at a record pace, Mashinsky continued to solicit new customers in a desperate bid to gather assets to provide liquidity to the struggling platform.

177.    During a May 27, 2022 AMA, Mashinsky offered a referral reward for customers stating, "You'll get $50 in crypto for each completed referral. Your friend will get a $50 referral reward too."

178.    Mashinsky continued his solicitation of new customers on May 29, 2022, when he tweeted, "These are hard times for many…. I will personally give one of the new @CelsiusNetwork users $1000 this week if you show you opened an account and started #HODLing [sic] to build your #FinancialFreedom."

179.    During May and June of 2022, Celsius added almost two thousand new users and $900 million of digital assets to the Celsius platform.

180.    Into June 2022, Mashinsky continued to falsely represent that Celsius had the necessary liquidity to meet customers withdrawals and that its customers' assets were safe.

181.    On June 1, 2022, in response to the hypothetical customer question "are our funds safe at Celsius?" Mashinsky responded, "yes, so not just that they're safe… we provided anyone who wanted to withdraw partially or fully, there were no problems." But, by May 25, 2022, Celsius had les than $11 billion in assets and $11.9 billion in liabilities.

182.    On a June 10, 2022 AMA, Mashinsky claimed that "Celsius has billions in liquidity" and that "anyone what want to withdraw has no problem…."

183.    Between June 10 and June 12, 2022, Celsius customers withdrew over $672 million in digital assets.

184.    On June 12, 2002 Celsius paused withdrawals in order to "stabilize liquidity." Celsius filed for bankruptcy on July 13, 2022 at which time it had over $4.7 billion in user liabilities and only $1.75 billion in digital assets.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and**
**Regulation 180.1(a)(1)-(3), 17 C.F.R. 180.1(a)(1)-(3) (2022) (Fraud)**

185.    The allegations set forth in paragraphs 1 through 184 are re-alleged and incorporated herein by reference.

> Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:
> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

186.    Regulation 180.1, 17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;  [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

187.    During the Relevant Period, Defendants intentionally or recklessly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, directly or indirectly:  used or employed, or attempted to use or employ, a scheme or artifice to defraud; made, or attempted to make, untrue or misleading statements of a material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading;  and/or engaged, or

attempted to engage, in acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person, including, but not limited to, Celsius customers.

188.     As a result of the foregoing conduct, Defendants' fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

189.     Defendants are directly liable for their actions in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)(3), 17 C.F.R. § 180.1(a)(1)-(3).

190.     Defendant Mashinsky directly or indirectly controlled Celsius did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) committed by.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as control person for each of Celsius' violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

191.     The acts and omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Celsius liable as principals for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

192.     Each and every use or employment or attempted use or employment of a scheme or artifice to defraud; or act of making or attempting to make untrue or misleading statements of a material fact or omitting to state a material fact necessary in order to make the statements not untrue or misleading; and act of engaging, or attempting to engage, in the acts, practices, or courses of business that operated or would have operated as a fraud or deceit on any person, including

Celsius customers, is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT TWO

### Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
### (Fraud and Deceit by CPOs and APs of CPOs)

193.     Paragraphs 1 through 192 are re-alleged and incorporated herein by reference.

194.     Section 1a(10) of the Act, 7 U.S.C. § 1a(10)(A), defines a commodity pool, in relevant part, as:

> any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any –
>
> (I) commodity for future delivery, security futures product, or swap . . . .

195.     Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity pool operator, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
> (I) commodity for future delivery, security futures product, or swap . . . .

196.     By reason of the foregoing, during the Relevant Period, Celsius engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

197.    During the Relevant Period, Celsius was not registered with the Commission as a CPO.

198.    Regulation 1.3, 17 C.F.R. § 1.3 (2022), defines an associated person of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

199.    By reason of the foregoing, during the Relevant Period, Defendant Mashinsky was associated with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged. Therefore, Defendant Mashinsky was an AP of a CPO as defined by 17 C.F.R. § 1.3.

200.    During the Relevant Period, Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

201.    7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

202.    By reason of the foregoing, Celsius, through use of the mails or any means or instrumentality of interstate commerce: knowingly or recklessly employed devices, schemes or artifices to defraud its customers ("pool participants") and prospective pool participants, or (2)

engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

203. By reason of the foregoing, Celsius violated 7 U.S.C. § 6*o*(1).

204. The acts or omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius is liable as principal for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6*o*(1).

205. Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6*o*(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6*o*(1).

206. Each misrepresentation and omission of material fact, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## COUNT THREE

**Violation of Sections 4k(2) and 4m(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1)
(Failure To Register as a CPO and AP of a CPO)**

207. Paragraphs 1 through 206 are re-alleged and incorporated herein by reference.

208. Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

209.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall be:

> unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent . . . in any capacity that involves
>
> > (i)     the solicitation of funds, securities, or property for a participation in a commodity pool or
> >
> > (ii)    the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

210.     By reason of the foregoing, Celsius engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

211.     Celsius, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO.

212.     By reason of the foregoing, Celsius acted as an unregistered CPO in violation of 7 U.S.C. § 6m(1).

213.     By reason of the foregoing, Defendant Mashinsky associated with a CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or the

supervision of persons so engaged; therefore, Defendant Mashinsky acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

214.    Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

215.    By reason of the foregoing, Defendant Mashinsky acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

216.    The acts or omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius is liable as principal for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6k(2).

217.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6m(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6m(1).

218.    Each instance that Celsius acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

219.    Each instance that Defendant Mashinsky acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

## COUNT FOUR

### Violation of Regulation 4.21, 17 C.F.R. § 4.21 (2022)
### (Failure to Provide Pool Disclosure Documents)

220.    Paragraphs 1 through 219 are re-alleged and incorporated herein by reference.

221.    17 C.F.R. § 4.21(a)(1) provides that:

> each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

222.    By reason of the foregoing, Celsius was required to be registered with the Commission as a CPO, but failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2022).

223.    By reason of the foregoing, Celsius violated 17 C.F.R. § 4.21.

224.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17 C.F.R. § 4.21 committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 17 C.F.R. § 4.2.

225.    Each failure to furnish the required disclosure documents to prospective pool participants and pool participants, including those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants, collectively and through their officers, employees and agents, violated 4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

B.    An order of permanent injunction prohibiting Defendants and any other person or

entity associated with them, from engaging in conduct described above, in violation of Sections 4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

C.    An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with Defendants, from directly or indirectly:

(i)  trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40));

(ii)  entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets that are commodities, as that term is described herein, for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii)  having any commodity interests or digital assets commodities traded on Defendants' behalf;

(iv)  controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities, as that term is described herein;

(v)  soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities;

(vi)  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(vii) acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.    An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F.    An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.    An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, Title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act, as

described herein;

H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.    Such other and further relief as the Court deems proper.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.

Dated: July 13, 2023

Commodity Futures Trading Commission

By its attorneys:

*/s/ Jonah McCarthy*
Jonah McCarthy
S.D.N.Y. Bar No. JM1977
Chief Trial Attorney
*jmccarthy@cftc.gov*

Jason Gizzarelli (*Pro Hac Vice to be filed*)
Senior Trial Attorney
*jgizzarelli@cftc.gov*

Traci L. Rodriguez (*Pro Hac Vice to be filed*)
Chief Trial Attorney
*trodriguez@cftc.gov*

Paul Hayeck (*Pro Hac Vice to be filed*)
Deputy Director
*phayeck@cftc.gov*

Commodity Futures Trading Commission
1121 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5000
(202) 418-5521(fax)

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*